Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
Brian B. Flynn (State Bar No. 314005)
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com
        brian@lozeaudrury.com

Nicole C. Sasaki (State Bar No. 298736)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, CA 94612
Tel: (510) 735-9700
Fax: (510) 735-9160
E-mail: nicole@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>GRANITE ROCK COMPANY, a California corporation,<br><br>Defendant. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

Plaintiff SAN FRANCISCO BAYKEEPER ("Baykeeper"), by and through its counsel, alleges as follows:

## INTRODUCTION

1.      This is a third-party enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "the Act"), 33 U.S.C. § 1365(a)(1), to address violations of the Act by Defendant Granite Rock Company ("Defendant") arising out of discharges of polluted storm water from Defendant's industrial facility located at 100 and 120 Granite Rock Way in San Jose, California ("Facility").  Since on or before November 15, 2015, Defendant has been discharging and continues to discharge polluted storm water from the Facility, in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.  Since on or before November 15, 2015, Defendant has also violated the General Industrial Stormwater Permit issued by the State of California, National Pollutant Discharge Elimination System ("NPDES") Permit General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 2014-0057-DWQ (collectively, the "General Permit").  Baykeeper seeks a declaratory judgment, injunctive relief, civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Act.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3.      On November 3, 2020, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the

California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of Baykeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

4.      More than sixty (60) days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## INTRADISTRICT ASSIGNMENT

6.      Intradistrict assignment of this matter to the San Jose Division of the Court is appropriate pursuant to Civil Local Rule 3-2(e).  The events or omissions which give rise to Baykeeper's claims occurred in Santa Clara County, which is under the jurisdiction of the San Jose Division of the Northern District of California.

## PARTIES

7.      Plaintiff Baykeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Oakland, California.  Baykeeper's approximately 3,500 members live and/or recreate in and around the San Francisco Bay area.  Baykeeper's mission is to defend San Francisco Bay from the biggest threats and hold polluters accountable to create healthier communities and help wildlife thrive.  To further these goals, Baykeeper actively seeks federal and state agency implementation of the Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in, San Francisco Bay and its tributaries, into which Defendant discharges pollutants.  Baykeeper members use and enjoy San Francisco Bay and its tributaries for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendant's

discharges of storm water containing pollutants impair each of these uses.  Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the General Permit.

9.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

10.      Defendant GRANITE ROCK COMPANY ("Granite Rock") is a California corporation that owns and/or operates the Facility that is at issue in this action.

## REGULATORY BACKGROUND

### The Problem of Storm Water Pollution

11.      Storm water runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay.  With every rainfall event, hundreds of millions of gallons of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and San Francisco Bay.  The Regional Board has stated that storm water pollution is the largest source of pollution entering San Francisco Bay and Bay area surface waters each year.

12.      Storm water runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, storm water can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate and nitrite.  Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects.  Heavy metals have been shown to alter activity in the tissue and blood of fish.

13.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS have been shown to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are adsorbed onto TSS.  Thus, higher concentrations of TSS mean higher

concentrations of toxins associated with those sediments.  Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

### The Clean Water Act

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     Section 402(b) of the Act, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges.  In California, the EPA has approved the State Board and its nine Regional Boards to administer an NPDES permit program for the State.  The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

16.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

17.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States.  *See* 40 C.F.R. § 122.2.  The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.  The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application.  40 C.F.R. § 122.21.

18.     Section 301(b) of the Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations

by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

19.     Section 505(a)(1) of the Act provides for third-party enforcement actions against any "person," including the United States, any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution, individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

20.     Section 505(a) of the Act authorizes third-party enforcement actions for injunctive relief. 33 U.S.C. § 1365(a).

21.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1), 1365(f), 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1-19.4.

**The General Permit**

22.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The current version of the General Permit went into effect on July 1, 2015.

23.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

24.     The General Permit contains several prohibitions. Effluent Limitation V(A) prohibits discharges unless pollutants have been reduced or prevented through implementation of BAT and

BCT.  Discharge Prohibition III(C) prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

25.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

26.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  General Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  *Id.*, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  *Id.*, Fact Sheet § I(1).

27.    Section X of the General Permit sets forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of

significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Dischargers must develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations and receiving water limitations.

28.     The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *Id*., § X(H)(1).  Failure to implement these minimum BMPs is a violation of the General Permit.  *Id*., Fact Sheet § I(2)(o).  The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  *Id*., § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.  *Id*.  The General Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table.  *Id*., § X(H)(4), (5).

29.     The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP").  *See* General Permit, §§ X(I), XI.  The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  Adequate monitoring and reporting ensures that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a

significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The General Permit mandates that facility operators sample four storm water discharges from all storm water discharge locations at a facility over the course of the reporting year.  *Id*., §§ XI(B)(2), (3).

30.     Under the General Permit, facilities must analyze storm water samples for TSS, oil and grease ("O&G"), pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code.  General Permit, § XI(B)(6).

31.     The State of California maintains a list of impaired waterways pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).  Coyote Creek is impaired for toxicity, based on sediment toxicity data.

32.     Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A).

33.     Section XI(B)(2) of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).  Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge.  General Permit, § XI(B).  A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period.  General Permit, § XI(B)(5).

34.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and

the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit, § XV.  Per Section XV(F) of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs."  After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation."  *Id.*  The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year."  General Permit, § XVI.

35.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

36.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; and iron – 1.0 mg/L.

37.     The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs.  The following annual NALs have been established under the General Permit: TSS – 100 mg/L; O&G – 15 mg/L; and iron – 1.0 mg/L.  The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

38.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the

instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.

39.    The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs.  General Permit § XII(A).  If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred.  General Permit, § XII(C).

40.    By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation.  General Permit, § XII(C)(1).  As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances."  *Id.*  No later than January 1 following commencement of Level 1 status, the Discharger must submit via the Stormwater Multiple Application and Report Tracking System ("SMARTS") a Level 1 ERA Report.  General Permit, § XII(C)(2).  The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL."  *Id.*  A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter."  *Id.*

41.    If sampling results for a given parameter indicate an NAL exceedance while the Discharger is in Level 1 status for that same parameter, the Discharger attains "Level 2 status," which commences on July 1 following the reporting year during which the exceedance occurred.  General Permit, § XII(D).

42.    By January 1 following the commencement of Level 2 status, the Dischargers must submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance.  General Permit § XII(D)(1)(a).  The Level 2 ERA Action Plan must identify which demonstrations (Industrial Activity BMPs Demonstration, Non-Industrial Pollutant Source

Demonstration, and/or Natural Background Pollutant Source Demonstration) the Discharger has selected to perform.  *Id.*  The Level 2 ERA Action Plan must include a schedule and a detailed description of the tasks required to complete the Discharger's selected demonstration(s).  General Permit, § XII(D)(1)(e)

43.    By January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger with Level 2 status must submit via SMARTS a Level 2 ERA Technical Report prepared by a QISP.  General Permit § XII(D)(2).  The Level 2 ERA Technical Report must include an Industrial Activity BMPs Demonstration, a Non-Industrial Pollutant Source Demonstration, and/or a Natural Background Pollutant Source Demonstration.  *Id*.  Dischargers who submit an Industrial Activity BMPs Demonstration in accordance with sections XII(D)(2)(a)(i) through XIID(2)(a)(iii) of the General Permit and who have implemented BMPs to prevent future NAL exceedance(s) return to baseline status if the results from four consecutive QSEs indicate no NAL exceedance(s) for the parameter(s) for which the Discharger has obtained Level 2 status.  General Permit, § XII(D)(4)(a).

**The Basin Plan**

44.    Section 303 of the Act, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.  The Act prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

45.    The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan, which contains Water Quality Standards for water bodies within its geographic area.

46.    The San Francisco Bay Regional Water Quality Control Board has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, which sets forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries.

47.    The beneficial uses of these waters identified in the Basin Plan include ground water recharge, commercial and sport fishing, cold freshwater habitat, fish migration, preservation of rare

and endangered species, fish spawning, warm freshwater habitat, wildlife habitat, water contact recreation, and noncontact water recreation.  Basin Plan at 2.2.  The noncontact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16.  Visible pollution, including muddy water from industrial areas, impairs people's use of Coyote Creek and the San Francisco Bay for water contact recreation and noncontact water recreation.

48.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." *Id.* at 3.3.18.  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.14.  The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 or raised above 8.5." *Id.* at 3.3.9.  The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use." *Id.* at 3.3.21.  The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.6.

## STATEMENT OF FACTS

### The Facility's Operations and Storm Water Discharges

49.     Defendant operates the Facility located at 100 and 120 Granite Rock Way in San Jose California.

50.     The Facility falls within SIC Codes 1429 and 3273.

51.     The Facility occupies an area of approximately 24.3 acres.

52.     The Facility is regulated by the General Permit.

53.     Plaintiff is informed and believes, and thereupon alleges, that storm water is collected and discharged from the Facility via at least nine storm water discharge locations.

54.     Plaintiff is informed and believes, and thereupon alleges, that storm water discharges from the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

55.     Industrial activities at the Facility include ready-mix concrete production, aggregate storage and handling, Portland cement and fly ash storage and handling, concrete batching, recycled baserock processing and storage, stone manufacturing, movement of material, vehicle maintenance and cleaning, vehicle fueling, and concrete and asphalt grindings recycling.

56.     The Facility discharges storm water into the San Jose municipal storm drain system, which discharges into Coyote Creek, which flows into the San Francisco Bay ("Facility Receiving Waters").

57.     Plaintiff is informed and believes, and thereupon alleges, that the Facility Receiving Waters are waters of the United States.

58.     Plaintiff is informed and believes, and thereupon alleges, that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

59.     Defendant submitted a NOI to comply with the General Permit to the State Board on or around April 6, 2015.

60.     Since at least November 15, 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were submitted to the State Board via SMARTS.

61.     In storm water sampling results submitted to the State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

62.     The Facility has reported numerous discharges in excess of numeric water quality standards for pH established in the Basin Plan.  These discharges have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.

63.     The pH levels in storm water discharges sampled by the Facility have not fallen within the Basin Plan's water quality objective of 6.5-8.5.  For example, on April 6, 2020, Defendant measured a pH value of 6 from four of the Facility's sample locations.  Defendant also measured a pH value outside of Basin Plan's water quality objective range on January 16, 2020, and January 5, 2017.

64.     The Facility has reported numerous discharges in excess of applicable NALs and EPA benchmarks for TSS and iron.  These discharges of pollutants from the Facility have violated Discharge Prohibitions III(B) and III(C) and Receiving Water Limitations VI(A) and VI(B) of the General Permit and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.

65.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively.  For example, on January 16, 2020, the level of TSS measured at one of the Facility's storm water outfalls was 1300 mg/L.  That level of TSS is 13 times the benchmark value and annual NAL for TSS. Defendant also measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on the following dates: April 6, 2020; January 16, 2020; January 9, 2020; November 27, 2019; March 6, 2019; February 14, 2019; January 15, 2019; November 29, 2018; March 20, 2018; March 13, 2018; March 1, 2018; January 8, 2018; November 16, 2017; March 21, 2017; January 18, 2017; October 28, 2016; January 5, 2016; December 22, 2015; November 9, 2015; and November 2, 2015.

66.     The levels of TSS in storm water detected by the Facility have exceeded the instantaneous maximum NAL for TSS of 400 mg/L established by the State Board because two or more analytical results from samples taken for TSS within a reporting year exceeded the instantaneous maximum NAL value.  Defendant measured two or more samples taken within a reporting year

exceeded the instantaneous maximum NAL value for TSS of 400 mg/L in each of the last five reporting years.

67.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1.0 mg/L established by EPA and the State Board, respectively.  For example, on January 16, 2020, the level of iron measured at one of the Facility's storm water outfalls was 55 mg/L.  That level of iron is 55 times the benchmark value and annual NAL for iron.  Defendant measured levels of iron in excess of 1.0 mg/L in every storm water discharge it measured from the Facility during the past five years, including the following dates: April 6, 2020; January 16, 2020; January 9, 2020; November 27, 2019; February 14, 2019; January 15, 2019; November 29, 2018; March 20, 2018; March 13, 2018; March 1, 2018; January 8, 2018; November 16, 2017; March 21, 2017; January 18, 2017; January 5, 2017; October 28, 2016; January 5, 2016; December 22, 2015; November 9, 2015; and November 2, 2015.

68.     On information and belief, Plaintiff alleges that since at least November 15, 2015, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, iron, TSS, and other potentially un-monitored pollutants.  Effluent Limitation V(A) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

69.     Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to collect discharge samples from proper discharge locations as required by Section XI(B) of the General Permit.  The Facility's SWPPP identifies at least nine discharge locations from which storm water discharges are to be collected from the Facility.  Defendant has consistently failed to collect and analyze storm water discharges from all of these sampling locations.  Moreover, Defendant has regularly failed to use consistent descriptions of the sampling locations, resulting in sampling location names in the Facility's Ad Hoc Monitoring Reports uploaded to SMARTS that do not correspond with the names contained on the laboratory results.  On information and belief, Baykeeper alleges that Defendant failed to comply with Section XI(B) of the General Permit as follows:

- **2019-2020 Reporting Year.**  Defendant failed to collect and analyze required

storm water samples during the November 29, 2019 sampling event; failed to collect and analyze a second sample from the "Br 410 Drain #2", and failed to collect and analyze any storm water samples from at least five of its discharge locations.

- **2018-2019 Reporting Year.** Defendant failed to collect and analyze required storm water samples during the November 27, 2018, November 29, 2018, January 15, 2019, February 14, 2019, and March 6, 2019 sampling events; and failed to collect and analyze any storm water samples from at least three of its discharge locations.

- **2017-18 Reporting Year.** Defendant failed to collect and analyze required storm water samples during the November 16, 2017, January 8, 2018, March 1, 2018, March 13, 2018, and March 20, 2018 sampling events; and failed to collect and analyze any storm water samples from at least four of its discharge locations.

- **2016-2017 Reporting Year.** Defendant failed to collect and analyze required storm water samples during the January 5, 2017, and January 18, 2017 sampling events; and failed to collect and analyze any storm water samples from at least seven of its discharge locations.

- **2015-2016 Reporting Year.** Defendant failed to collect and analyze required storm water samples during the January 5, 2016 sampling event; and failed to collect and analyze any storm water samples from at least four of its discharge locations.

70.     Plaintiff is informed and believes, and thereupon alleges, that local precipitation data shows that discharges from qualifying storm events occurred on multiple dates during which the Facility was open but failed to collect and analyze required storm water discharge samples. Specifically, Baykeeper alleges that Defendant failed to collect and analyze required storm water discharges as follows:

- Failure to collect a second sample during first half of 2019-2020 reporting year.
- Failure to collect a second sample during first half of 2018-2019 reporting year.

- Failure to collect a second sample during first half of 2017-2018 reporting year.
- Failure to collect a second sample during first half of 2016-2017 reporting year.
- Failure to collect a second sample during second half of 2015-2016 reporting year.

71.     On information and belief, Plaintiff alleges that Defendant collected and analyzed storm water samples from several storms that were not QSEs because they were not preceded by 48-hours with no discharge.  Accordingly, Plaintiff alleges that Defendant failed to collect and analyze storm water samples from one of the required QSEs from its nine storm water discharge locations as required by the General Permit during the following periods:

- Second half of the 2019-2020 reporting year.
- Second half of the 2018-2019 reporting year.
- First half of the 2018-2019 reporting year.
- Second half of the 2017-2018 reporting year.
- First half of the 2017-2018 reporting year.

72.     On information and belief, Plaintiff alleges that Defendant failed to analyze its storm water samples collected on March 6, 2019, and February 14, 2019 for iron.

73.     Section XVI(A) of the General Permit requires dischargers to certify and submit Annual Reports by July 15th of each year.  Section XVI(B)(3) requires that the Annual Report include "[a]n identification including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year."  Plaintiff alleges that Defendant has failed to submit an Annual Report in compliance with Section XVI(B)(3) of the General Permit since at least July 15, 2016.

74.     On information and belief, Plaintiff alleges that since at least November 15, 2015, Defendant has failed to implement an adequate SWPPP for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific BMPs for the facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include each of the mandatory elements required by the General Permit.  Baykeeper alleges that the SWPPP fails to comply with the requirements of Section X(A)(10) (failure to include initial

preparation date); Section X(E) (failure of map to show locations of all drainage areas, municipal

storm drain inlets, and structural control measures); Section X(G)(1)(e) (failure to include evaluation

of authorized non-storm water discharges ("NSWDs"); Section X(G)(2)(b) (failure to identify

minimum BMPs); and Section X(H) (failure to implement advanced BMPs).  The SWPPP also fails to

identify and implement advanced BMPs that are not being implemented at the Facility because they do

not reflect best industry practice considering BAT/BCT.  According to information available to

Plaintiff, the Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where

necessary to further reduce pollutant discharges.

75.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and

continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General

Permit.

76.     On information and belief, Plaintiff alleges that Defendant's Level 2 Technical Report

– Industrial Activity BMPs Demonstration, submitted via SMARTS on or about December 27, 2018,

fails to comply with the requirements of Section XII(C)(2) of the General Permit in the following

regards: failure to acknowledge the specifics of the particular NAL exceedances associated with the

various drainage areas from the Facility; failure to rectify the sampling location differences and

deficiencies described above between the Facility's reported analysis of storm water discharges and

the lab reports; failure to acknowledge and address BMPs for all of the Facility's storm water

sampling locations; failure to acknowledge that the Facility's November 29, 2018 sampling results,

taken subsequent to the Facility's implementation of the bioswales, showed tremendous NAL

exceedances for both TSS and iron, demonstrating the need for the Facility to evaluate and implement

additional BMPs to reduce or prevent NAL exceedances; and failure to provide a description of the

active treatment system mentioned in the report.

77.     Information available to Baykeeper indicates that as a result of the above practices,

storm water containing excessive pollutants is being discharged from the Facility during rain events

into channels that discharge into the San Jose municipal storm drain system, which discharges into

Coyote Creek, which flows into the San Francisco Bay.  Information available to Plaintiff indicates

that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from

the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and Economically Achievable**
**and Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

78.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

79.     Effluent Limitation V(A) of the General Permit as well as its SWPPP requirements require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, iron, and other potentially un-monitored pollutants in violation of Effluent Limitation V(A) of the General Permit.

80.     Each day since November 15, 2015, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

81.     Defendant has been in violation of the BAT/BCT requirements every day since November 15, 2015.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

83.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges

to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

84.   Plaintiff is informed and believes, and thereupon alleges, that since at least January 5, 2017, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards for pH in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

85.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pollutants at levels above applicable water quality standards.  The storm water from the Facility flows untreated into channels that flow into the Facility Receiving Waters.

86.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

87.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

88.   Every day since at least January 5, 2017, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Failure to Certify and Submit Complete Annual Reports**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

89.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

90.     Defendant is required to submit an Annual Report each year that, *inter alia*, identifies all revisions made to the Facility's SWPPP within the reporting year.

91.     Despite revising its SWPPP each reporting year, Defendant consistently failed to report such changes in its Annual Reports.

92.     Each day since July 15, 2016, that the Facility operates without submitting a complete Annual Report is a violation of Section XVI(B)(3) of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

93.     Defendant has been in violation of the Permit's Annual Report requirements every day since July 15, 2016.  Defendant continues to be in violation of the Annual Report requirements each day that it fails to submit complete Annual Reports for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

94.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

95.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

96.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

97.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

98.     Each day since November 15, 2015, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

99.     Defendant has been in violation of the General Permit's SWPPP requirements every day since November 15, 2015.  Defendant continues to be in violation of the SWPPP requirements

each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

## FIFTH CAUSE OF ACTION
### Failure to Develop and Implement an Adequate Monitoring Implementation Plan
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

100.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

101.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

102.    Defendant has failed to develop and implement an adequate MIP for the Facility.

103.    Defendant's ongoing failure to develop and implement an adequate MIP program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all storm water discharge locations at the Facility and Defendant's failure to collect and analyze samples from all QSEs.

104.    Each day since at least November 15, 2015, that Defendant has failed to develop and implement an adequate MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## SIXTH CAUSE OF ACTION
### Failure to Comply with Requirement for Exceedance Response Actions
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

105.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein

106.    Section XII(D)(2)(a) of the General Permit requires that an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report contain, *inter alia*, when implemented BMPs are not expected to eliminate future NAL exceedances, "1) [a]n evaluation of additional BMPs that would reduce or prevent NAL exceedances; 2) [e]stimated costs of additional BMPs evaluated; and, 3) [a]n analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented."

107.     Defendant has failed to submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report that complies with the requirements of Section XII(D)(2)(a) of the General Permit.

108.     Each day since at least December 27, 2018, that Defendant has failed to prepare and submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  This is an ongoing and continuous violation of the Act.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests this Court to grant the following relief:

a)  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b)  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c)  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d)  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e)  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f)  Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

g)  Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

h)  Order Defendant to submit complete and accurate Annual Reports that reflect the changes to the Facility's SWPPP;

i)  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the

Act and the Court's orders;

j) Order Defendant to prepare an adequate Level 2 ERA Technical Report;

k) Order Defendant to pay civil penalties of up to $56,460 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

l) Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

m) Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

n) Award any such other and further relief as this Court may deem appropriate.


Respectfully submitted,

Dated:  January 14, 2021                    SAN FRANCISCO BAYKEEPER


_____*/s/ Nicole C. Sasaki*_____
Nicole C. Sasaki
Attorneys for Plaintiff


LOZEAU DRURY LLP


_____*/s/ Douglas J. Chermak*_____
Douglas J. Chermak
Attorneys for Plaintiff